Laura LAHEY, Plaintiff,

v.

SINGAPORE AIRLINES, LTD., Defendant.

No. 98 Civ. 1665(MGC).

United States District Court, S.D. New York.

Oct. 5, 2000.

Moghadassi & Associates, New York City, by Antonia Kousoulas, Roya Moghadassi, for Plaintiff.

Condon & Forsyth, LLP, New York City, by Stephen J. Fearon, Bartholomew Banino, for Defendant.

## OPINION

CEDARBAUM, District Judge.

Laura Lahey sues Singapore Airlines, Ltd. ("Singapore") for injuries she sustained when she was assaulted by a fellow passenger on a flight from Singapore to New York City via Amsterdam. She also seeks attorney's fees. The parties agree that this case is governed by the Warsaw Convention.[1]

At the two-day bench trial, plaintiff's case consisted of Lahey's testimony and several exhibits. Defendant presented the testimony of Chee Yoke Seng, Quah Way Yan, and Chew How Yang as well as the deposition testimony of Claudien Rako. I found Lahey to be a very credible witness.

### FACTS

The essential facts are not in dispute. Laura Lahey boarded Singapore Airlines flight SQ26 from Singapore to New York at approximately 11:15 p.m. on June 26, 1997. She was accompanied by her three children and their nanny, Maribec Putian. Lahey and her eldest daughter took their assigned seats in row forty-four of the aircraft. Putian and the other two children were seated directly in front of Lahey and her daughter, in row forty-three.

While the plane was still at the gate and Lahey was waiting for the other passengers to board the plane, she pushed her seat back fully in order to recline. Soon, Lahey noticed that the passenger seated directly behind her was "shoving his knees into the back of [her] seat." The parties agree that this passenger was F.W. DeKoning.

The flight pushed back from the gate and began taxiing to the runway shortly after midnight. By this time, Lahey had returned her seat to its full, upright position for taxi and takeoff. While the plane was taxiing, Lahey complained to flight attendant Claudien Rako that DeKoning had been kicking and pushing her seat. Rako asked DeKoning to stop pushing Lahey's seat. Rako also told the lead stewardess, Quah Way Yan, about Lahey's complaint. Quah then informed the in-flight supervisor, Chew How Yang, of the problem. Chew spoke to Lahey and DeKoning while the aircraft was taxiing and determined that DeKoning was upset because when Lahey's seat was in a reclining position, he did not have sufficient leg room. Chew advised DeKoning that he would try to solve the problem after takeoff.

After takeoff, as soon as the crew notified passengers that it was safe to push their seats back, Lahey pushed her seat back to recline. Again, she felt DeKoning pushing and kicking her seat. Lahey rang for a flight attendant, who told DeKoning to stop kicking and pushing the seat. It is clear from the testimony that Lahey complained about DeKoning's behavior several times.

In response to these complaints, the crew suggested several possible solutions to the problem between DeKoning and Lahey. Chew suggested that DeKoning switch seats with his wife, who was seated behind Lahey's daughter's upright seat. DeKoning refused. Chew asked Lahey if she would like to switch seats with her daughter so that when she pushed her seat

---

1. Convention for the Unification of Certain Rules Relating to International Transportation by Air concluded at Warsaw, Poland, October 12, 1929, 49 Stat. 3000, reprinted in 49 U.S.C. § 40105 note.

back, she would not hit DeKoning's legs. Lahey's daughter was sleeping, and Lahey refused to change her seat. Chew also offered DeKoning the opportunity to move with his wife to seats in the exit row. DeKoning refused to move. After Chew determined that neither Lahey nor De-Koning was willing to move to another seat, he went to begin bar and meal service. Chew advised the crew to monitor the situation between Lahey and DeKoning. For some time the situation appeared to calm down. Quah testified that Lahey appeared to be sleeping during the meal service.

After the meal service, approximately two hours into the flight, the crew was serving coffee and tea. Lahey noticed a beverage cart coming down the aisle and, in order to avoid the cart, took her pillow from the aisle side of her seat and placed it against her daughter's upright seat. Shortly thereafter, she was punched from behind through the gap between her reclined seat and her daughter's upright seat. The blow knocked Lahey's eyeglasses from her face. The frame of the glasses was broken, and one lens fell out. Lahey stood up and turned around. As she did, a food tray was thrown at her. Lahey was shouting at the DeKonings while cleaning food from herself and her daughter, when she was struck on the side of her head with a plastic entree dish. The blow caused a laceration of the scalp which bled. Quah escorted Lahey to the business class cabin to help her clean up. She gave Lahey ice to apply to her head to stop the bleeding. Meanwhile, DeKoning and his wife were relocated to different seats.

Lahey later went to speak to Captain Chee. Chee asked Lahey if she wanted to press charges. Lahey said that she did. Chee notified the authorities in Amsterdam, and Mr. DeKoning was arrested upon the plane's arrival in the Netherlands.

Lahey suffered a cut on her nose and on her head in the assault. She was given ice by the crew and was seen by paramedics in Amsterdam. By the time the plane landed in Amsterdam, the bleeding had stopped. Lahey did not receive stitches. Lahey did not receive pain medication, and did not see a physician upon her return to New York. Lahey had a bump on her head and experienced soreness for approximately two weeks. She still has a small dent in her head, approximately the size of a dime, where she was struck.

## APPLICABLE LAW

■ Article 17 of the Warsaw Convention defines an airline's liability for the personal injury of a passenger. Article 17 provides that:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Lahey had the burden of proving by a fair preponderance of the credible evidence that an "accident" on board the aircraft was the proximate cause of her injuries. The Second Circuit has held that an assault committed by another passenger can be an accident under the Warsaw Convention. *Wallace v. Korean Air*, 214 F.3d 293 (2d Cir.2000). The issue in this case is whether the assault committed by DeKoning was such an "accident."

Accident is not defined in the Warsaw Convention. The Supreme Court addressed the meaning of the term in *Air France v. Saks*, 470 U.S. 392, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). The *Saks* plaintiff permanently lost hearing in one ear when her eardrum was damaged by the pressurization of the aircraft. All of the available evidence indicated that the aircraft's pressurization system operated normally throughout the flight. Thus, the Court addressed the "narrow issue" of whether a passenger whose injury "was caused by the normal operation of the

aircraft" was injured by an Article 17 accident. *Saks*, 470 U.S. at 396, 105 S.Ct. at 1341.

The Court carefully examined the text and negotiating history of the Warsaw Convention. The Court noted the distinct language employed for personal injury and loss of baggage in the Warsaw Convention. Article 17 imposes liability for personal injury caused by an "accident," whereas Article 18 imposes liability for loss or damage to baggage caused by an "occurrence." Thus, the Court reasoned that an accident must mean something more than an occurrence on the plane. The Court held that "liability under Article 17 of the Warsaw Convention arises only if a passenger's injury is caused by an unexpected or unusual event or happening that is external to the passenger. This definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Id.* at 405, 105 S.Ct. at 1345.

The Court recognized that the misconduct of a fellow passenger could be an "accident." *Id.* at 405, 105 S.Ct. at 1345. The Second Circuit has recently addressed this issue in the context of a sexual assault. *Wallace*, 214 F.3d 293. The *Wallace* plaintiff was seated in economy class on a Korean Air flight. The passenger seated next to her sexually assaulted her while she was sleeping. The district court held that the incident was not an "accident" for purposes of Article 17 because there "was no act or omission by the aircraft or airline personnel representing a departure from the normal, expected operation of a flight," and because "sexual molestation . . . is not a risk characteristic of air travel or related to the operation of an airplane." *Wallace v. Korean Air*, No. 98 Civ. 1039, 1999 WL 187213, at *4–5 (S.D.N.Y. Apr. 6, 1999).

The Second Circuit reversed, holding that the assault in *Wallace* was a risk characteristic of air travel. *Wallace*, 214 F.3d at 299. The court noted that Wallace "was cramped into a confined space beside

two men she did not know, one of whom turned out to be a sexual predator." *Id.* Lahey's position is indistinguishable. Lahey was seated in the confined space of economy class, in front of a man she did not know, who turned out to be violently hostile to Lahey's desire to recline in her seat.

Contrary to the position defendant advanced at trial, the actions of the crew are not relevant to the determination of whether the assault was an "accident" because it is clear that nothing in the term "accident" suggests a requirement of culpable conduct on the part of the airline crew. Lahey testified that she was "shocked and surprised" when she was struck on the temple from between the seats. No member of the crew expected that DeKoning would throw his tray at Lahey. The incident was certainly "unexpected and unusual" and "external" to Lahey. *Saks*, 470 U.S. at 396, 105 S.Ct. at 1341. As such, it was an accident under Article 17.

## DAMAGES

■ During the trial, Lahey sought to recover her attorney's fees for this action under the Warsaw Convention. Plaintiff pointed to the Montreal Agreement of 1966,[2] which raised the liability limit to $75,000, in support of her claim for attorney's fees. The Montreal Agreement reads, in pertinent part:

> The limit of liability for each passenger for death, wounding, or other bodily injury shall be the sum of U.S. $75,000 *inclusive of legal fees and costs*, except that in case of a claim brought in a State where provision is made for separate award of legal fees and costs, the limit shall be the sum of U.S. $58,000 *exclusive of legal fees and costs*. (emphasis added).

Plaintiff argued that this language permits legal fees to be awarded in the United States, where such awards are not sepa-

---

**2.** *Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague*

Protocol, May 13, 1966, CAB 18900, 49 Stat. 3000, reprinted in 49 U.S.C. § 40105 note.

rately made, so long as the total amount awarded does not exceed $75,000. But the purpose of this language was to provide sufficient recovery in those countries in which the plaintiff bears his own fees, while not providing too great a recovery in countries in which a victorious plaintiff is separately compensated for his legal fees in addition to his damages. *See generally,* Andreas F. Lowenfeld and Allan I. Mendelsohn, *The United States and the Warsaw Convention,* 80 Harv. L.Rev. 497, 552–76 (1967) (discussing the Montreal Agreement). This language and its history do not authorize a deviation from the American rule, which requires each party to pay its own attorneys in the absence of an express statutory provision to the contrary. *See Alyeska Pipeline Serv. Co. v. The Wilderness Soc.,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975).

■ The only remaining question is the amount of Lahey's damages. Lahey did not seek medical care after the plane arrived in New York. She received no pain medication, and has presented no evidence of medical bills. Her eyeglasses were broken, but she presented no evidence of either their value or their replacement cost. Lahey was understandably upset as a result of the incident and feared that DeKoning might cause further harm. She suffered a cut on her nose and her scalp. She had a bump on her head that was sore for a few weeks, and she still has a small dent in her head where she was struck. Although Singapore argues that Lahey's own negligence contributed to the incident, and that her damages should be proportionately diminished in accordance with Article 21, Singapore does not point to any evidence of improper conduct by Lahey that proximately caused her injuries.

Lahey is awarded $10,000 as compensation for her physical injuries and mental anguish. The Clerk is directed to enter judgment for the plaintiff in that amount plus taxable costs.

The foregoing shall constitute my findings of fact and conclusions of law under Fed.R.Civ.P. 52(a).

SO ORDERED.